Edward **BROWDER**, Petitioner,

v.

**UNITED STATES of America,**
**Respondent.**

**Civ. No. 73–987.**

United States District Court,
D. Oregon.

Aug. 15, 1975.

Thomas M. Schneiger Federal Defender Section, Metropolitan Public Defender, Portland, Or., for petitioner.

Sidney I. Lezak, U. S. Atty., John S. Ransom, Asst. U. S. Atty., D.Oregon, Portland, Or., for respondent.

## OPINION

SKOPIL, District Judge:

Petitioner seeks habeas corpus relief under 28 U.S.C. § 2255.

Petitioner, Edward Browder, alias James Chisum-Burns, was charged by federal indictments in Oregon, Florida, and California and by federal information in Georgia with pledging stolen securities transported in interstate commerce. 18 U.S.C. § 2315. He agreed to transfer the pending out-of-district cases into Oregon for consolidated sentencing under Fed.R.Crim.P. 20. He was arraigned on all four cases before The Honorable Alfred T. Goodwin on November 4, 1970. He was represented by attorney John Flynn, who is now deceased. His pleas of guilty to all charges were accepted by the Court. On January 6, 1971, he was sentenced by The Honorable Gus J. Solomon, who imposed four ten-year terms and one five-year term, twenty-five years of which were to run consecutively. Petitioner's motions for modification of sentence were denied. Fed.R.Crim.P. 35. He is presently incarcerated at the U. S. Penitentiary at McNeil Island in Washington.

Petitioner challenges the validity of his conviction and sentence on the following grounds:

(1) His guilty pleas were not made with effective assistance of counsel;

(2) Either the Court and the Government failed to honor a plea bargain that the sentence would not exceed three years or no such agreement existed, in which case petitioner's plea was involuntary and unknowing;

(3) The Court relied upon erroneous information regarding petitioner's criminal record in imposing sentence;

(4) Judge Goodwin violated Fed.R. Crim.P. 11 in accepting petitioner's guilty plea because he failed to advise petitioner of the maximum possible penalty or of the possibility of consecutive sentences;

(5) The sentence imposed constituted cruel and unusual punishment and denied petitioner equal protection of the law.

Edward Browder is a 53 year old man with extensive business experience in promotion and sales. He has a college background in aeronautical engineering. His testimony on the witness stand revealed a degree of intelligence and a facility with the English language that would be the pride of most attorneys. The quality of his in forma pauperis brief enhances that observation.

In 1958 Mr. Browder somehow became involved with organized crime. A crime syndicate apparently stole the bonds which he was indicted for transporting and pledging. Browder alleges that in 1967 or 1968 he attempted to sever his connections with the syndicate. He moved to Ashland, Oregon, from Florida and assumed the name of James Chisum-Burns.

He engaged John Flynn as his legal counsel to represent him regarding purchase of some ranch property. Flynn is described as a "gruff, very precise, professional man" with a CPA and tax law background. Browder was impressed with the precision and general competence with which Flynn seemed to be handling his property transaction. So when Browder was arrested on the securities charges, he immediately contacted Flynn.

In the initial jail interview he advised Flynn of the charges against him and revealed to him for the first time his true identity. Flynn allegedly told him that he was not a criminal lawyer but was intimately acquainted with the U. S. Attorney's office personnel and with the judges in the Oregon District. He represented that these contacts would enable him to arrange for a satisfactory plea bargain.

In a later visit Flynn advised Browder to have all charges pending in the various jurisdictions consolidated for a guilty plea under the federal rules. He also recommended that Browder remain incarcerated in Rocky Butte Jail rather than obtain release on bond because detention in the jail's notorious conditions was likely to arouse the sympathy of the sentencing judge. Browder testified that Flynn told him he should avoid trial and reduce his exposure to a ten-year term by pleading guilty. He testified that Flynn told him he could expect substantially less than ten years— probably three years. During later conversations Flynn said he had "arranged" for Browder to serve a maximum three-year sentence. He also represented that with good behavior, Browder could probably obtain parole after only one year.

Browder's son and wife testified that Flynn made similar statements to them about having made a "deal" for a three-year sentence. No individual participants were identified, but Flynn did say the U. S. Attorney's office and the District Court or the "Government" were involved. Mrs. Browder expressed misgivings about Flynn's loyalty to her husband. She sensed a change in Flynn's attitude toward him after he became aware that "Mr. Chisum-Jones" had retained him regarding the ranch purchase under false pretenses. In spite of her warnings Mr. Browder followed Flynn's recommendations.

Accordingly, he filled out guilty plea forms in each of the four cases. The plea forms advised him, in writing, of his *Miranda* rights. In blank spaces so provided he wrote in the maximum sentence which could be imposed on each count. None of the forms made mention of the possibility of consecutive sentences, however, or of the maximum time that could accrue under a consecutive sentence. Browder testified that he never was informed of either of these matters by anyone and that on the day of sentencing he harbored the belief that ten years and a $10,000 fine was the maximum he could receive.

The evidence clearly shows that no plea bargain was ever made with either the U. S. Attorney's office or with any judge. In fact, the Assistant U. S. Attorney has no memory of any attempts to obtain a plea bargain.

Browder testified that he was shocked at the sentence given to him. After his sentence was pronounced, he turned to Flynn and asked him what happened. He was taken from the courtroom without receiving a reply and never received any communication from Flynn again.

Browder's wife and son contacted Flynn after the sentencing. He advised them there could be no appeal. He returned Browder's letters unopened. Flynn died several months later.

Petitioner speculates that Flynn's professional pride and character judgment were wounded when petitioner confessed that he had retained him under false pretenses. Petitioner concludes, from hindsight, that Flynn sealed his wounds by "screwing him".

## I.

Petitioner's first two grounds may be considered together. I find that there was no plea bargain which either the Court or the Government could have breached.

Whether Flynn did represent to Browder that he had negotiated a plea bargain on his behalf is more difficult to determine. The most credible evidence in support of that allegation is the testimony of Browder's wife and son and Mrs. Doris Moss, a real estate broker, that Flynn told them on various

occasions that Browder would receive a three-year sentence. If such statements were made, they may have been merely speculations by Flynn and misconstrued as representations. The witnesses disclaim this possibility because of Flynn's characteristic caution and precision and his abhorrence for vague prophecies.

Browder's own credibility is muddled by the footprints of his criminal history. His lucid memory, flowing dialogue, analytical mind, and appreciation for the finer nuances of words and factual details are salient personality traits. They also constitute the tools of his avocation—the con game. His biography makes it difficult to determine whether his representations are true or a form of underground artistry.

The testimony of John Flynn is the critical, missing ingredient. On the other hand, it may also be the tactical vehicle which enables Browder to fabricate his harrowing tale of injustice. His unfortunate death may be the chief obstacle to Browder's legitimate pursuit of justice.

Other things being equal in their obscurity, I am compelled to rest my judgment in the evidence of petitioner's own handwriting. On November 4, 1970, Edward Browder signed four "PETITION[S] TO ENTER PLEA[S] OF GUILTY" to the charges outlined in the various indictments and information previously described. Paragraph (8) of each of those forms states that

> "I declare that no officer or agent of any branch of government (Federal, State or local) *nor my lawyer*, nor any other person, has made any promise or suggestion of any kind to me, or within my knowledge to anyone else, that I will receive a lighter sentence, or probation, or any other form of leniency if I plead 'GUILTY'." (emphasis added)

In response to specific inquiries by Judge Goodwin and Judge Solomon during arraignment and sentencing, petitioner also denied that any promises had been made to him.

Petitioner claims that he signed those forms and made those responses with the knowledge that they were false. He explains that he did so upon the advice of his lawyer and with the understanding that this was merely a distasteful requirement of the "plea bargain theatre". Petitioner requests that I take judicial notice that at the time of his pleas, the plea bargain process was a charade. Those involved, including the judge, went to great lengths to avoid any public language which would reveal the existence of the plea bargains to which they secretly vowed allegiance. The defendant's critical role in this drama was allegedly to declare that no such agreement was made. Only then did the agreement become binding.

Whatever the practice may have been in other jurisdictions, such gaming was not condoned in this district in 1970. Petitioner asks me to vacate his pleas on the ground that he was deceived by the customs of other jurisdictions. Petitioner asks too much. I will not presume that such deception occurred. It is a haunting possibility, but petitioner has not sustained his burden of proof in that regard. Hopefully the strong current trend toward airing plea bargains in open court will become a uniform practice throughout the country so that similar uncertainty will be eliminated in future cases.

## II.

Browder also claims that the failure of Judge Goodwin and Judge Solomon to expressly advise him of the maximum possible sentence and of the possibility of consecutive sentencing misled him.

■ I find that the governing Fed. R.Crim.P. 11 was complied with in this case. Petitioner's handwritten statements on the guilty plea forms reveal his knowledge of the maximum sentence for each individual charge. His intelligence, his previous experience with criminal law and procedure, and his retention of legal counsel belie his ignorance of the total maximum sentence and of the risk

of consecutive sentencing. See *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); *Eagle Thunder v. United States*, 477 F. 2d 1326 (8th Cir. 1973); *United States v. Frontero*, 452 F.2d 406 (5th Cir. 1971); *Johnson v. United States*, 460 F.2d 1203 (9th Cir. 1972).

### III.

█ Petitioner also claims that the sentencing judge relied upon erroneous information in petitioner's criminal record. This claim is based upon the sentencing judge's remark that petitioner was "the worst crook that has ever come before this Court" and that his "record is one of the most abominable records I have ever seen".

These expressions of opinion may have been exaggerated but are not clearly refuted by petitioner's record.

### IV.

█ Petitioner's final argument is that imposition of a twenty-five year sentence for his "white collar" property crimes constituted cruel and unusual punishment and violated equal protection of the law.

The basis for petitioner's claim is a study he conducted of 100 cases involving similar white collar crimes. If accurate, his study contains startling statistics. Of the 100 defendants studied, 20% received fines, probation, or suspended sentences only for acts involving $350,000,000 or more. The others studied received light sentences for a variety of swindles in which the public became victim to members of the Mafia, labor union officials, mayors, attorneys, stock brokers, business executives, bankers, a former state Attorney General, a governor, a federal judge, and others.

I can only speculate on the motivations for sentences rendered in the individual cases listed. As Mr. Browder observes, "wherein the greater the offense against capital, the lesser the punishment imposed by the sentencing court". If Mr. Browder's study is accurate, the pattern of sentencing revealed is deplorable.

If there is a logic to this paradox, it eludes me. I cannot reconcile a policy of sending poorly educated burglars from the ghetto to jail when men in the highest positions of public trust and authority receive judicial coddling when they are caught fleecing their constituencies. Penology's recent enchantment with rehabilitation as a wholesale justification for imprisonment has dissolved in the face of numerous studies proving that rehabilitation rarely occurs. A minority of the prison population are rightfully locked up because they are too dangerous to release. If we are to justify imprisonment for the rest, it must be on the grounds of punishment or deterrence. And if this is our premise, the white collar criminal must come to expect equal or greater treament than the common, non-violent thief. The consequences of a white collar property crime tend to reach a higher magnitude in direct proportion to the level of status and power held by the criminal involved. The men Browder studied abused their influence to defraud thousands of people throughout the country out of millions of dollars. Apparently this has been tolerated through light sentencing because of the staggering proportions of the crime.

█ The defect in Browder's reasoning is his conclusion that because other white collar criminals have been receiving disparate treatment, he should too. As a matter of law, I cannot review the propriety of the sentence he received. The sentence was within statutory limits. 18 U.S.C. § 2315. Therefore it was a constitutional product of the trial court's discretion. *United States v. Floyd*, 477 F.2d 217 (10th Cir. 1973); *Gurleski v. United States*, 405 F.2d 253 (5th Cir. 1968). As a matter of jurisprudence, I will comment on his sentence in the context of his study. The sentencing judge may have shared my dismay, and Browder's, at the pattern of white collar crime sentences. White

collar crime pays. It will continue to do so as long as judges endorse it through their sentencing policy.

Imprisonment is hardly a panacea. Well-crafted parole and probation programs and requirements of restitution are usually better solutions. I doubt that deterrence will be very effective until the "executive" becomes convinced that if he embarks on a criminal adventure, he will be severely—though proportionately—punished. Certainty is the key.

Edward Browder was convicted of pledging over $500,000 worth of stolen securities. He concedes his guilt for those crimes. The fact that they were accomplished by means of wit and charm rather than a burglar's tool does not minimize the damage done to the public. The judge who sentenced Browder obviously shared that view. It is a tragedy, if Browder's study is accurate, that fewer judges—and not more of them— subscribe to it also.

Petitioner's petition is denied.

This Opinion shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).